UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

KATHLEEN HERT,⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀vs.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀Case No. 1:10CV167 CDP
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
MICHAEL J. ASTRUE,⠀⠀⠀⠀⠀)
Commissioner of Social Security,⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀Defendant.⠀⠀⠀⠀⠀)

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Kathleen Hert's application for

supplemental security income benefits under Title XVI of the Social Security Act,

42 U.S.C. §§ 1381 *et seq.*  Hert claims she is disabled because she suffers

vasovagal syncope, arthritis, a cyst on her spine, pelvic inflammatory disease,

Marfan Syndrome, mitral valve prolapse, and bursitis.  The Administrative Law

Judge concluded, however, that Hert is not disabled, and Hert now appeals that

decision.  Because I conclude that the ALJ's decision is supported by substantial

evidence, I will affirm the decision of the Commissioner.

## Procedural History

On December 12, 2003, Kathleen Hert filed for supplemental security

income payments alleging disability beginning in 1996.  The Social Security

Administration denied Hert's application at the initial level. Missouri is one of several states participating in modifications to the disability determination procedures, which include the elimination of the reconsideration step in the administrative appeals process. 20 C.F.R. § 416.1406, 416.1466 (2011). Hert's appeal in this case therefore proceeded directly from this initial denial to the administrative law judge level. Hert appeared and testified at a hearing on March 4, 2005. The ALJ issued an opinion on October 21, 2006 upholding the denial of benefits. Hert filed a request for review with the Appeals Council on December 7, 2006, and filed a new application for benefits on October 7, 2008. The second application was denied, but the Appeals Council remanded the case based on the December 2003 application and consolidated it with the later 2008 application. Hert appeared and testified for a second hearing on April 6, 2009. The ALJ issued an opinion on January 12, 2010 upholding the denial of benefits. After considering an additional statement provided by the claimant, the Appeals Council denied Hert's request for review. Accordingly, the ALJ's determination stands as the Commissioner's final determination. The ALJ determined that Hert had not been disabled since December of 2003, and that is the decision now before me.

## Testimony Before the ALJ

At the time of the second administrative hearing, Hert was thirty-eight years old and lived with her husband and two children, ages fourteen and seventeen. She was a high school graduate, and had completed training as a CNA.

Hert testified that she had Marfan Syndrome and had developed a rapid heart rate.  She stated that she had many other complications related to Marfan, a connective tissue disorder, including dislocated lenses in her eyes, tearing of various tendons, and muscle deterioration in her feet.  She testified that she had to wear braces on both feet because of the muscle deterioration.  Hert also stated that she suffered from spurs in her feet and hands, arthritis, migraine headaches, muscle spasms, high cholesterol, bulging discs, and fibromyalgia.  Due to pain from the degenerative joints and bulging discs, Hert received nerve block shots in her neck.  She stated that she had a lot of anxiety disorders, including posttraumatic stress disorder and an adjustment disorder with isolation.  She testified that her medications included atenolol, Esgic-Plus, Zanaflex, Voltaren, Simvastatin, and Ventolin.  She stated that the Zanaflex made her tired, and so she tried to only take it once at night rather than the prescribed three times daily.

Hert stated that she did not work at the time of the hearing.  Her most recent job was with a cattle auction, from 2006 until 2008.  She worked one day a week for approximately seven or eight hours, and was responsible for penning cattle

after they were sold at auction.  The job ended in December of 2008 because the cattle auction closed.  Prior to the cattle auction, Hert clerked for Cell Barn in Poplar Bluff in 2001.  She had also worked as a filing clerk at a veterinary clinic for a few months in 1998.  In 1995 and 1996, Hert had worked as a CNA.  She stated that she left the CNA job because of her health issues.

When asked about her daily activities, Hert said she typically woke up around six or seven in the morning in order to get the kids up for school.  She stated that the children were largely capable of caring for themselves.  Hert testified that after her kids left for school, she typically just sat around the house.  She stated that she watched television, or occasionally would clean the house a little bit.  She said she did not read much because her eyes were bad.  She would occasionally play video games on a Playstation, but did not own or use a computer.  Hert also testified that she listened to music and played with her pet bird.  When questioned further about cleaning, Hert stated that she would vacuum and sweep, but that her daughter also helped clean a lot because of her neck pain and migraines.  Hert testified that she cooked, but on days when she could not, her family would fix something for themselves.  The only times she left the house were to go to the doctor's office or the grocery store.  She did not belong to any social groups or religious organization.

Hert further testified that she was not supposed to lift anything over ten pounds because of her neck and spine issues, her degenerative joint disease, and because of spurs in her hands. She stated that Dr. Varma gave her this restriction. Hert also said she had difficulty walking, and that there were days when she could hardly touch the floor with her feet because of pain caused by spurs and nerve damage. She had braces she was supposed to wear because she was having difficulty controlling her feet, but stated she was unable to wear them because the hard plastic was too painful against her spurs. She also claimed to have difficulty sitting because of arthritis in her lower back and hip, and because of rotoscoliosis. Hert stated that she had difficulty getting herself out of the bathtub. She said she also had numbness in her hands, making it difficult or painful to grip things and therefore to complete chores such as washing dishes. She stated she had constant neck and back pain, which was made worse by walking and climbing steps. Hert testified that she could not sit, lay, or stand without pain, and that while she was capable of bending to touch her knees, it was painful to stand back up.

The ALJ called a vocational expert, Susan Shea, who had been provided with and reviewed Hert's file, including her past work history. Shea testified that Hert had previously worked as a secretarial clerk, certified nurse's aid, auction helper, and as a cook in a nursing home. The ALJ described a hypothetical individual for Shea of Hert's age, education, and work experience; who could lift

twenty pounds on occasion and ten pounds frequently; who could stand and/or walk about six hours in an eight-hour workday and could sit at least six hours; who should avoid concentrated exposure to noxious fumes, odors, dust and gases; and who should avoid working where she would have to ambulate on unimproved surfaces like plowed or open fields.

The ALJ then asked Shea whether this hypothetical person could perform Hert's past work or any other jobs.  Shea replied that such an individual could work as a secretarial clerk, but if the person was limited to simple and repetitive work, could not perform any of Hert's past work.  Shea testified that such an individual could work as a receptionist, could do sedentary hand assembly work, and could do order taking work.  Shea further testified that such an individual could perform light work as a charge account clerk, and factory or assembly work at the light level.

The ALJ then asked about a hypothetical individual with the same characteristics except this person could only occasionally grip with the left upper extremity, which would be the dominant upper extremity, but had no restriction on the right, non-dominant upper extremity.  Shea replied that this individual could not perform any of the jobs available to the first hypothetical individual, nor any other jobs.  The ALJ then described a hypothetical individual who had the same characteristics as hypothetical one, but who would miss, for medical reasons, more

than two days a month every month.  Shea replied that this individual could not

maintain any jobs.  Finally, the ALJ described an individual who could show up

every day for work, but at least once a week, for some medical reason, had to show

up late, leave early, or step away from the work setting for the equivalent of at

least one additional break time, and for whom this was a weekly but not

predictable occurrence.  Shea replied that this would preclude competitive

employment for the individual after a short period of time.

### **Medical Records**

On January 13, 2003, Hert visited George Samuel, M.D. for hip, leg, and

back pain.  Dr. Samuel noted that Hert's spine, hip, and knee were tender.

Magnetic resonance imaging of Hert's left hip on January 21, 2003 revealed no

evidence of acute bony change and MRI of her lumbar spine revealed no

significant bulging or herniated disc.  X-ray of her left knee on February 4, 2003

revealed no significant acute disease.  Hert visited Thomas Joseph, M.D. on

February 3, 2003, who noted that Hert had slight discomfort in her L4-5 region

without paravertebral spasm, tenderness over her left hip, discomfort moving her

left knee patella, and medial joint line tenderness.  Dr. Joseph noted no obvious

instability of her knee.

On February 26, 2003, Dr. Samuel noted that Hert's chest was clear and that

her heart had a regular rate.  Hert visited Dr. Samuel three times in March

complaining that her heart was racing.  In June of 2003, Hert went to the emergency room because she passed out and was having chest pain.  She was examined by Alan Braverman, M.D.  Dr. Braverman noted that Hert was in no acute distress, was alert and oriented, her mood and affect were normal, her lungs were clear with good air movement, and echocardiogram, electrocardiogram, and computerized tomography of her chest were all normal.

On June 27, 2003, Hert went to the Pain Management Center for neck and back pain.  The examiner noted that she was pleasant, alert, cheerful, and cooperative.  She had some tenderness to the cervical and lumbar spines, difficulty flexing her head and neck, some crepitus in her left knee, and some slight decreased sensation.  Her lungs were clear and she had good grip strength.  An echocardiogram on July 3, 2003 revealed very mild left ventricle hypertrophy, trace tricuspid insufficiency, mild mitral and pulmonary insufficiency, and mild mitral valve prolapse.  On July 21, 2003, Hert saw Shahid Choudhary, M.D., who noted that she was alert and oriented, and had 5/5 strength of her extremities.  On July 30, 2003, Hert visited the Family Counseling Center Inc., where she was observed to be alert and cooperative, albeit sad and anxious.  She had a good memory and was oriented, with a GAF of 49.

On August 20, 2003, Dr. Joseph noted that Hert had some slight discomfort in her left ankle, but no other problems with her foot or ankle.  She returned to the

Family Counseling Center on September 2, 2003, where Ravdeep Khanuja, M.D. noted that she appeared cooperative, had a linear thought process, and had a GAF of 50.  Hert received a triple phase nuclear medicine bone scan on September 25, 2003, which revealed mild increased activity in her right foot.

Echocardiography on October 9, 2003 revealed trace aortic insufficiency and trace mitral regurgitation.  An eye examination on November 26, 2003 revealed that Hert had 20/60 vision in her right eye and 20/25 vision in her left eye.  She returned to Dr. Khanuja on December 12, 2003, and told him that her mood was better.

In January of 2004, Hert visited Prem K. Varma, M.D. for joint and back pain.  Dr. Varma noted that Hert had some decreased range of motion.  X-rays on January 6, 2004 revealed normal lumbosacral spine.  Examination of Hert's foot on January 7, 2004 revealed some tenderness, and an x-ray showed spur posterior and plantar aspect of the calcaneus.  After undergoing an endometrial biopsy because of heavy menstruation, Hert underwent total abdominal hysterectomy and bilateral salpingo-oophorectomy in January of 2004.  Dr. Young noted that her surgical sites had largely healed by February 20, 2004.  On February 27, 2004, Hert reported having mild migraine headaches.

Hert returned to Dr. Varma on March 11, 2004, who noted decreased range of motion for her left shoulder.  An MRI of the shoulder on March 12 revealed

tendinopathy, a couple of tendon tears, and small joint effusion.  On April 1, 2004,

Dr. Varma noted some muscle spasms of Hert's left shoulder.  Hert was examined

by Mazheer Hussain, M.D. at the Family Counseling Center on October 12, 2004,

who noted that she was alert and oriented, had a goal directed thought process,

good concentration, and an intact memory.  On November 30, 2004, Hert reported

at the Family Counseling Center that she was improving.

In January and February of 2005, Hert saw Abdul N. Naushad, M.D. at

Bluff Pain Center.  She had positive straight leg raise sign, tenderness of the

cervical and lumbar spine, and a normal gait.  An MRI of her left knee on

November 29, 2005 revealed moderate patellar chondropathy.

An echocardiogram on July 25, 2006 revealed moderate atrial septal defect

and mild pulmonic valvular regurgitation.  A nuclear stress study at Heart and

Vascular Center of West Tennessee on August 2, 2006 was normal.  On October

11, 2006, Hert denied having any joint pain, paraesthesias, nervousness, anxiety,

or increased stress.  Her lungs were clear, and she had no abnormalities of her

back.  An October 26, 2006 chest x-ray revealed no acute process.

Tests in January of 2007 revealed mild mitral valve regurgitation, mild

tricuspid valve regurgitation, mild aortic insufficiency, and trace pulmonary

insufficiency, as well as early degenerative arthritis of the cervical spine and

minimal bulging disc.  X-rays of Hert's left knee, tibia, and fibular revealed mild

-10-

degenerative arthritis.  Hert complained of leg, hand, neck and back pain in February of 2007, but x-rays of her left wrist and hand were normal.

X-rays of Hert's lumbar spine on May 11, 2007 were normal.  Seeing Hert multiple times from May through December of 2007, Dr. Hussain repeatedly observed that she had tenderness to her spine and diminished sensation of her lower extremities, but had 5/5 muscle strength and normal gait and station.  June x-rays of her hand were normal, as were December x-rays of her left knee.

Hert had a sinus infection on January 18, 2008, and bronchitis on February 5, 2008.  Echocardiogram on February 8, 2008 revealed trace tricuspid regurgitation.  Hert continued seeing Dr. Hussain from January through April of 2008.  Dr. Hussain repeatedly noted a mildly antalgic gait and normal station, tenderness of the spine, diminished sensation of her lower extremities, and normal mood and affect.  X-rays of her left ankle on February 14, 2008 were normal, as were x-rays of her elbow on February 29.  An MRI of her cervical spine on April 10, 2008 revealed disc protrusion at C4-5 that mildly deformed the ventral cord and mild left C6-7 foraminal stenosis.

On May 15, 2008, Hert visited Zakwrie Parr, M.D. for heel pain.  On May 30, 2008, she visited the Tinsley Medical clinic, where it was noted that she was alert and oriented, her heart was regular, and her lungs clear.  Hert returned to Dr. Parr on July 16, 2008, who noted decreased sensation for her lower extremities

and inflamation and swelling of the plantar fasciitis.  On July 25, 2008, her lungs were clear and her heart was regular.  An August 20, 2008 MRI of Hert's foot revealed small osteochondral lesions, mild degenerative arthritis, small spur, and effusion.  MRI of her left ankle revealed partial tear of the tendon, small spur, and small effusion.

On September 5, 2008, Hert's heart was regular but her lungs had minimal coarse sounds, and on November 9, 2008, Navid Siddiqui, M.D. noted a few rhonchi.  From August to October of 2008, Hert reported intermittent improvement in her left foot.  On January 5, 2009, she went to the Advanced Healthcare Samuel Medical Clinic for back, head and neck pain.  She presented with no symptoms of a psychiatric condition.  She returned to the clinic in March, where she denied having psychiatric symptoms, and her lungs were again clear.

On March 9, 2009, Hert went to Midwest Neurosurgeons LLC, where she appeared alert and oriented, with good memory and attention.  She had 5/5 motor strength and normal gait and station.  During multiple visits to Advanced Healthcare Samuel Medical Clinic in April of 2009, it was noted that Hert's lungs were clear and she continuously denied psychiatric symptoms.  An April 7, 2009 MRI of Hert's left hand revealed mild marrow contusion, distal shaft and head, fourth proximal phalanx, and soft tissue injuries.

Hert was examined by Annamaria R. Guidos, M.D. on October 16, 2009, who noted that Hert could perform daily living activities independently. Hert's gait and station were normal, her neck and lumbar spine had normal range of motion, and she had 5/5 strength. Hert was also examined by Jerrell L. Driver, Ph.D. on October 16, 2009. Dr. Driver observed that Hert was calm, oriented, and able to perform calculations. Dr. Driver further indicated that Hert's impairments did not affect her ability to understand, remember, and carry out instructions, but that she would have moderate limitations in her ability to interact appropriately with others and to respond appropriately to usual work situations and changes in a routine work setting.

## Legal Standard

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001). Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the ALJ's conclusion. *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, *id.*, or because the court would have decided the case differently. *Browning v. Sullivan*,

958 F.2d 817, 822 (8th Cir. 1992).  In determining whether existing evidence is

substantial, a court considers "evidence that detracts from the Commissioner's

decision as well as evidence that supports it."  *Singh v. Apfel*, 222 F.3d 448, 451

(8th Cir. 200) (citation omitted).

　　　　To determine whether the decision is supported by substantial evidence, the

Court is required to review the administrative record as a whole to consider:

> (1)　the credibility findings made by the Administrative Law Judge;
>
> (2)　the education, background, work history, and age of the
> claimant;
>
> (3)　the medical evidence from treating and consulting physicians;
>
> (4)　the plaintiff's subjective complaints relating to exertional and
> non-exertional impairments;
>
> (5)　any corroboration by third parties of the plaintiff's impairments;
> and
>
> (6)　the testimony of vocational experts when required which is
> based upon a proper hypothetical question.

*Brand v. Secretary of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th

Cir. 1980).

　　　　Disability is defined in the social security regulations as the inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than twelve

months.  42 U.S.C. § 416(i)(l); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§

404.1505(a) and 416.905(a).  In determining whether a claimant is disabled, the

Commissioner must evaluate the claim using a five-step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial

gainful activity.  If the claimant is engaging in substantial gainful activity, he is not

disabled.

Next, the Commissioner determines if the claimant has a severe impairment

which significantly limits the claimant's physical or mental ability to do basic work

activities.  If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether

the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404,

Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the

Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current

work activity or medical facts alone, and the claimant has a severe impairment, the

Commissioner reviews whether the claimant can perform his past relevant work.  If

the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner

must evaluate whether the claimant can perform other work in the national

-15-

economy.  If not, the Commissioner declares the claimant disabled.  20 C.F.R. §§ 404.1520 and 416.920.

When evaluating evidence of subjective complaints, the ALJ is never free to ignore the subjective testimony of the claimant, even if it is uncorroborated by objective medical evidence.  *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984).  The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole.  *See, e.g., Battles v. Sullivan*, 992 F.2d 657, 660 (8th Cir. 1990).  In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Hecler*, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. the claimant's daily activities;
>
> 2. the duration, frequency, and intensity of the pain;
>
> 3. precipitating and aggravating factors;
>
> 4. dosage, effectiveness and side effects of medication;
>
> 5. functional restrictions.

*Id.* at 1322.

## The ALJ's Findings

The ALJ found that Hert does not suffer from a disability within the meaning of the Social Security Act at any time through the date of the decision.

He issued the following specific findings:

1.    The claimant is not fully credible in her allegations about the severity of her symptoms and limitations.

2.    The claimant has not engaged in substantial gainful activity since 2003.

3.    The medical evidence establishes that the claimant has severe impairments of Marfan's syndrome; arthritis and other abnormalities of different joints including the knees, elbow, shoulder, feet, and hands; fibromyalgia; migraines; bulging discs cervical and lumbar spine; asthma and other breathing impairments; heart problems; hyperglycemia; neuropathy; and mental impairments variably diagnosed as different disorders such as post traumatic stress disorder and adjustment disorders.

4.    The claimant does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 3.

5.    Under the special technique for evaluating mental impairments, 20 C.F.R. § 416.920a (2009), the claimant has psychiatric conditions variably diagnosed as disorders such as post traumatic stress disorder and adjustment disorders, but they do not precisely satisfy the diagnostic criteria of Part A of listings such as 12.04 and 12.06.  In addition, the claimant's mental impairments do not meet the Part B criteria.  She has slight limitations of activities of daily living; and moderate limitations of social functioning and of concentration, persistence, or pace.  The claimant has no episodes of decompensation within one year, each lasting for at least two weeks. Her mental impairments do not meet the Part C criteria.

-17-

6.    The claimant has the maximum residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently.  The claimant can sit, stand, and walk for six hours.  The claimant should avoid concentrated exposure to respiratory irritants.  She should avoid work that requires ambulation on unimproved surfaces.  She is limited to simple and/or repetitive work that does not require close interaction with the public.  20 C.F.R. § 416.945 (2009).

7.    The claimant is unable to perform her past relevant work.

8.    The claimant is a younger individual; has at least a high school education; and has skilled past relevant work experience, but any skills she might have acquired would not transfer to work within her residual functional capacity.  20 C.F.R. §§ 416.963, 416.964, 416.968 (2009).

9.    Using Rule 202.21 as a framework for making a decision and noting that vocational expert testimony indicates that the claimant's non-exertional limitations do not significantly erode the light occupational base, there are jobs that exist in the national economy that the claimant can perform when her vocational factors and residual functional capacity are considered.  Such jobs include work in sedentary hand assembly, with 6,000 jobs in Missouri; in sedentary machine work, with 5,400 jobs in Missouri; and in light factory assembly, with 20,000 jobs in Missouri.

10.    The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision.  20 C.F.R. § 416.920(g) (2009).

The ALJ concluded that although Hert's impairments were severe in combination, the medical records did not support her allegations about the severity of her limitations.  The ALJ found that although examinations of Hert occasionally revealed tenderness, decreased sensation, and anxiety, most diagnostic imaging and testing revealed minimal abnormalities.  He found that despite Hert's

-18-

complaints, she was repeatedly reported to be cheerful and alert.  The ALJ further

found that medical tests and observations by treating physicians revealed only

mild or moderate impairments.  He found that Hert was not fully credible,

particularly given the contradictions between her allegations about the severity of

her symptoms as compared with her medical records and her ability to perform

daily activities.

## **Discussion**

When reviewing a denial of Social Security benefits, a court cannot reverse

an ALJ's decision simply because the court may have reached a different outcome,

or because substantial evidence might support a different outcome.  *Jones ex rel.*

*Morris v. Barnhard*, 315 F.3d 974, 977 (8th Cir. 2003); *Woolf v. Shalala*, 3 F.3d

1210, 1213 (8th Cir. 1993).  Instead, the court's task is a narrow one: to determine

whether there is substantial evidence on the record as a whole to support the ALJ's

decision.  42 U.S.C. § 405(g); *Estes v. Barnhard*, 275 F.3d 722, 724 (8th Cir.

2002).  On appeal, Hert raises two main issues.  First, she argues that the ALJ erred

in finding that Hert did not suffer an impairment or combination of impairments

that met or medically equaled one of the listed impairments found at 20 C.F.R. Part

404, Subpart P, Appendix 1.  Second, she argues that the ALJ improperly

determined Hert's residual functional capacity.  Because I find that the ALJ's

-19-

decision denying benefits was supported by substantial evidence, I will affirm the decision.

### Hert's Impairments did not Meet or Equal an Appendix 1 Listing

Hert argues that the ALJ's determination that her impairments did not meet or equal one of the listed impairments in Appendix 1 was not supported by substantial evidence. "For a claimant to show that [her] impairment matches a listing, it must meet all of the specified medical criteria." *Marciniak v. Shalala*, 49 F.3d 1350, 1353 (8th Cir. 1995) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). "A claimant carries the burden of establishing that [her] condition meets or equals all specified medical criteria." *McCoy v. Astrue*, 648 F.3d 605, 611 (2011) (citing *Marciniak*, 49 F.3d at 1353). Hert not only fails to present any evidence that her impairment or combination of impairments met the criteria of any Appendix 1 listings, but she fails to even identify which listing she believes she met.

After thoroughly discussing the medical records, the ALJ found that Hert's impairments failed to meet the requirements of Listings 1.02, 1.04, 3.03, 4.01, 9.08, 11.00, 11.14, and 14.06. (Tr. 24-25.) The ALJ also discussed Hert's mental impairments, concluding that they did not satisfy the diagnostic criteria of Part A of Listings 12.04 and 12.06. (Tr. 25.) He further concluded that Hert's limitations of activities failed to satisfy the Part B requirements of the same listings, and that there

was no objective medical evidence to support a finding that her impairments met the Part C requirements.  (Tr. 25.)  I therefore find that Hert failed to meet her burden of establishing that her condition met or equaled an Appendix 1 listing, and that the ALJ's finding was supported by substantial evidence.

<u>The ALJ Properly Determined Hert's Residual Functional Capacity</u>

Hert argues that in determining her residual functional capacity, the ALJ's findings were not supported by substantial evidence and did not consider her impairments in combination.  A claimant's residual functional capacity is what he or she can still do despite physical or mental limitations.  20 C.F.R. pt. 404.1545(a); *Lauer v. Apfel*, 245 F.3d 700, 703 (8th Cir. 2001).  The ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence."  *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000).  Although the ALJ is not limited to considering only medical evidence in making this assessment, the ALJ is "required to consider at least some supporting evidence from a professional," because a claimant's residual functional capacity is a medical question.  *Lauer*, 245 F.3d at 704.

Here, the ALJ determined:

The claimant has the maximum residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently.  The claimant can sit, stand, and walk for six hours.  The claimant should avoid concentrated exposure to respiratory irritants.  She should avoid work that requires ambulation on unimproved surfaces.  She is limited to

> simple and/or repetitive work that does not require close interaction
> with the public.

The ALJ based this determination on substantial evidence from the medical records.

"Although required to develop the record fully and fairly, an ALJ is not required to

discuss every piece of evidence submitted." *Wildman v. Astrue*, 596 F.3d 959, 966

(8th Cir. 2010) (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)).

Furthermore, "[a]n ALJ's failure to cite specific evidence does not indicate that such

evidence was not considered." *Id.*  Here, the ALJ addressed each component of the

RFC determination, citing relevant medical support for his findings.  His decision

makes clear that these are just some of many examples he relied on.  Taken in

combination with his extensive discussion of the medical records elsewhere in the

decision, it is clear that the ALJ's findings are based on substantial evidence from

the medical record as a whole.

For example, the ALJ concluded that although Hert's impairments would be

expected to limit her ability to lift and carry objects, the evidence failed to support

limitations as severe as Hert alleged.  The ALJ cited Hert's 2003 visit to the Pain

Management Center, where it was determined that she had good grip strength.  The

same visit showed that despite some tenderness to the cervical and lumbar spine,

Hert had full range of motion for her left shoulder.  The ALJ further cited an

October 11, 2006 visit when Hert denied having any joint pain, and her April 25,

2008 admission that medication helped control the pain.  The ALJ also relied on

-22-

diagnostic imaging tests from February 29, 2008, which revealed a normal elbow and only mild abnormalities in Hert's hand.  The ALJ considered a March 9, 2009 visit to Midwest Neurosurgeons, where examination revealed Hert had 5/5 motor strength, and Dr. Guidos's October 2009 statement that Hert could perform light work.

Regarding his determination that Hert could sit, stand, and walk for six hours, the ALJ relied on the fact that most examiners observed Hert to have at most minimal antalgic gait, and normal station.  He noted that no examiner observed significant limitations to Hert's ability to sit, and diagnostic imagings further supported this conclusion.  The ALJ specifically referred to a January 26, 2007 MRI that revealed only minimal bulging disc of the cervical spine, a December 21, 2007 x-ray showing that her left knee was normal, and a February 14, 2008 x-ray of Hert's left ankle that was also normal.  Additional evidence in the medical record also supports the ALJ's finding.  Triple phase nuclear medicine bone scan on September 25, 2003 revealed only mild increased activity in Hert's right foot.  X-rays on January 6, 2004 revealed normal lumbosacral spine.  Although a January 7, 2004 x-ray revealed spur posterior and plantar aspect of the calcaneus in Hert's foot, Dr. Naushad twice observed in February of 2005 that Hert had a normal gait.  X-rays of Hert's left knee in January of 2007 revealed only mild degenerative arthritis.

The ALJ determined that Hert should avoid concentrated exposure to respiratory irritants, but noted that the medical records showed her lungs were often observed to be clear and testing and diagnostic imaging revealed only minimal abnormalities of Hert's heart.  A July 3, 2003 echocardiogram revealed very mild left ventricle hypertrophy, trace tricuspid insufficiency, mild mitral and pulmonary insufficiency, and mild mitral valve prolapse.  Echocardiography on October 9, 2003 revealed trace aortic insufficiency and trace mitral regurgitation.  A July 25, 2006 echocardiogram revealed moderate atrial septal defect and mild pulmonic valvular regurgitation, but an August nuclear stress test was normal.  An October 2006 chest x-ray revealed no acute process.  An echocardiogram in February of 2008 revealed trace tricuspid regurgitation.  Hert's heart was observed to be regular and her lungs clear during visits to the Tinsley Medical Clinic both in May and July of 2008.  While Hert's lungs had minimal coarse sounds in September of 2008 and Dr. Siddiqui observed a few rhonchi in November of 2008, examinations again revealed her lungs to be clear by March of 2009.

Finally, the ALJ determined that Hert was limited to simple and/or repetitive work that did not require close interaction with the public due to her mental impairments, pain, fatigue, and side effects from the medication.  The ALJ found that despite Hert's GAF being rated at 55 or less, few examiners ever reported that Hert had any significant limitations due to mental impairments.  He cited the fact

-24-

that on June 4, 2003, it was noted that Hert's mood and affect were normal, and as recently as January 5, 2009, she presented with no significant symptoms of a psychiatric condition.  The ALJ further noted that during visits within this duration, examiners noted that Hert was pleasant, cooperative, alert, and oriented.  On September 2, 2003, Dr. Khanuja observed that Hert was cooperative and forthcoming, and her thought process was linear.  On October 12, 2004, Dr. Hussain noted that Hert was alert, oriented, calm, and cooperative.  Dr. Hussain noted that both Hert's mood and affect seemed normal during a May 21, 2007 visit. During a July 30, 2003 examination, she was observed to have a good memory, and on October 16, 2009, Dr. Guidos noted that her attention and concentration were normal.

        As evidenced above, the ALJ's decision cited the specific parts of the record as well as the specific doctors' opinions on which he relied.  Furthermore, the ALJ indicated that he did not find Hert to be wholly credible, and thus discounted her account of pain and limitations accordingly.  Evidence of pain and severity of other symptoms is necessarily subjective in nature.  Therefore, an ALJ must look to more than just objective medical evidence, or the lack thereof, in determining whether and to what extent a claimant's symptoms affect the ability to perform work-related activities.  *Halpin v. Shalala*, 999 F.2d 342, 346 (8th Cir. 1993); *Delrosa v. Sullivan*, 922 F.2d 480, 485 (8th Cir. 1991).  Under the framework set forth in

*Polaski v. Heckler*, 739 F.2d 1320, 1321-22 (8th Cir. 1984), an ALJ must fully

consider all evidence relating to the subjective complaints, including the claimant's

work record, as well as observations of the claimant by others (including treating

and examining doctors) as to such matters as daily activities; the intensity, duration,

and frequency of the symptoms and conditions causing and aggravating the

symptoms; and functional limitations.  *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir.

2008).  An ALJ is permitted to discount the claimant's complaints if they are

"inconsistent with the evidence as a whole."  *Id*. (quoting *Casey v. Astrue*, 503 F.3d

687, 695 (8th Cir. 2007)).  When discounting a claimant's complaints, the ALJ is

required to "detail the reasons for discrediting the testimony and set forth the

inconsistencies found."  *Ford*, 518 F.3d at 982 (quoting *Lewis v. Barnhart*, 353

F.3d 642, 647 (8th Cir. 2003)).

Here, the ALJ properly considered Hert's testimony and made credibility

findings supported by evidence in the record.  The ALJ determined that Hert's

testimony was not credible in part because there was a lack of medical evidence

supporting her claims.  Although an ALJ may not discount testimony solely due to a

lack of medical evidence, this is one factor that may properly be considered.

*Halpin v. Shalala*, 999 F.2d 342, 346 (8th Cir. 1993).  In addition to discrepancies

between Hert's alleged symptoms and pain and the medical records as discussed

above, the ALJ also considered inconsistencies within Hert's testimony and written

reports.  Hert completed multiple copies of the Disability Report – Adult – Form SSA-3368.  In these forms, she reported having between five and seven good days per month, with as many as twenty-one fair days.  On the forms and during her testimony, she described how she could largely take care of herself, and did both light housework and cooking.  As recently as 2008 she spent one day a week working at a cattle auction, and on March 10, 2009, reported that she had been playing basketball.  The ALJ appropriately considered the inconsistences between these accounts and Hert's alleged limitations when determining her credibility.

Finally, Hert argues that the ALJ did not address the relationship between her various impairments.  However, the Eighth Circuit has held that an ALJ properly considers the combined effects of a claimant's impairments when the ALJ separately discusses each impairment and still concludes that the claimant does not have a combination of impairments that render her disabled.  *Martise v. Astrue*, 641 F.3d 909, 924 (8th Cir. 2011).  As discussed at length above, the ALJ adequately discussed each of Hert's various impairments in detail before determining her residual functional capacity.  He has thus satisfied the Eighth Circuit standard for considering the combined effects of a claimant's impairments.

For the reasons discussed above, I find that the decision denying benefits was supported by substantial evidence, and I will affirm the ALJ's decision.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner denying benefits is affirmed.

A separate judgment in accord with this Memorandum and Order is entered this date.


_Catherine D. Perry_
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 9th day of April, 2012.